**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| ACE AMERICAN INSURANCE COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>D&G TOWING AND AUTO REPAIR SERVICES, INC. and TREVOR LIBERT,<br><br>Defendants. | ) | No. 1:24-cv-11416-JEK |

**MEMORANDUM AND ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**

**KOBICK, J.**

This declaratory judgment action arises out of a dispute over which insurance company should indemnify and defend defendant Trevor Libert and his employer, defendant D&G Towing and Auto Services, Inc., for claims stemming from a car accident. That accident, between Libert and non-party Patricia Fisher, occurred while Libert was driving a van that D&G had obtained from non-party Export Enterprises of Massachusetts, Inc. in exchange for services D&G provided. Following the accident, Libert and D&G demanded that plaintiff ACE American Insurance Company indemnify and defend them against any claims brought by Fisher. In their view, they qualify as insured entities under the insurance agreement between ACE and Export because Libert was driving a covered vehicle when the accident happened. ACE denied the request and then filed a lawsuit in this Court, seeking a declaration that it owes no coverage or defense to Libert or D&G. The defendants asserted counterclaims seeking a declaration that ACE owes them coverage under the insurance policy.

After Fisher sued Libert and D&G in Massachusetts state court and discovery ended in this case, the parties filed cross-motions for summary judgment. Libert and D&G argue that ACE owes them coverage under two different sub-policies in the agreement between ACE and Export: a Covered Autos sub-policy and the Compulsory Bodily Injury sub-policy required by Massachusetts law. For the reasons that follow, the parties' motions will be granted in part and denied in part. ACE is entitled to a declaration that the defendants do not qualify as insured entities under its Covered Autos sub-policy and that it owes them no pre-suit defense, but the defendants are entitled to a declaration that ACE owes them coverage under the Compulsory Bodily Injury sub-policy and that any coverage provided by their own insurer is excess to that from ACE.

## BACKGROUND

The following facts, unless otherwise noted, are either undisputed or recounted in the light most favorable to the non-moving party. *See Roberge v. Travelers Prop. Cas. Co. of Am.*, 112 F.4th 45, 51 (1st Cir. 2024) ("This lens . . . do[es] not change where the parties file cross-motions for summary judgment.").

### I. <u>The Parties.</u>

Plaintiff ACE is an insurance company that is incorporated and has its principal place of business in Pennsylvania. ECF 2, at 1. Defendant D&G Towing and Auto Repair Services, Inc. was originally incorporated by non-parties Gabriella Estrada Marins and Romulo Marins on October 1, 2007 as "D&G Towing, Inc." for the primary purpose of providing towing services. ECF 41, ¶ 16. It is a Massachusetts corporation located at Emery Road in Allston, Massachusetts. *Id.* ¶ 17. On September 15, 2008, D&G Towing, Inc. amended its Articles of Incorporation to

change its name to "D&G Towing and Auto Repair Services, Inc." (hereinafter "D&G"). *Id.* ¶ 18.[1] Defendant Libert is a Massachusetts resident who, as of July 10, 2022, worked as either an employee or independent contractor for D&G. ECF 1, ¶ 3; ECF 25, ¶ 15.

## II. <u>The Underlying Accident and Litigation.</u>

Non-party Export Enterprises of Massachusetts, Inc. owned a 2012 Ford van (the "Vehicle") that it used as part of its business. ECF 25, ¶ 7. In 2018, Export provided the Vehicle to D&G in exchange for services D&G had performed, and D&G picked up the Vehicle from Export. ECF 41, ¶¶ 1-3; ECF 25, ¶ 10. Despite D&G's repeated requests, Export never executed or sent the Vehicle's certificate of title to D&G. ECF 41, ¶¶ 3, 7-8. Instead, Export provided D&G with a repair plate (i.e., a type of license plate) in 2018 and, each year thereafter, renewed that plate and delivered updated registration stickers to D&G. *Id.* ¶¶ 4, 9.

In 2022, Export informed D&G that a certificate of title would be provided to D&G. *Id.* ¶ 12. Based on that update, D&G instructed Libert—an employee or independent contractor of D&G who was operating the Vehicle within the scope of his employment—to take the Vehicle to a location where D&G advertising would be applied to the exterior. *Id.* ¶¶ 12, 29; ECF 40, ¶ 6; ECF 31-3 (Romulo Marins' Rule 30(b)(6) testimony), at 53:8-19, 55:2-15. Libert was driving the Vehicle as directed when, on July 10, 2022, he was involved in an accident with a pedestrian named Patricia Fisher. ECF 40, ¶¶ 1, 6-7.

---

[1] Separately, on June 18, 2021, the Marins incorporated "D&G Auto Repair Corp.," an auto repair business initially operating out of the Emery Road location. ECF 41, ¶ 20; ECF 31-8. On August 6, 2021, D&G Auto Repair Corp. changed its name to "D&G Auto Body Corp." and moved its business address to 386 Arsenal Street in Watertown, Massachusetts. ECF 41, ¶¶ 21-23. D&G Auto Body currently does business as "D&G Auto Sales." ECF 25, ¶ 3. It is not a party to this lawsuit. Additionally, in 2024, D&G opened a repair shop at 70 North Beacon Street in Watertown, Massachusetts. ECF 41, ¶ 24; *see* ECF 31-2, at 36:12-37:18.

At the time of the accident, D&G was insured under a policy issued by Commerce Insurance Company, Business Auto Policy No. BDQRVN, which provides primary insurance coverage to D&G for any automobile that D&G owns. ECF 40, ¶ 16; ECF 25-2, at 44. For automobiles not owned by D&G, Commerce's coverage is "excess over any other collectible insurance." ECF 25-2, at 44. Also at the time of the accident, Export was insured by a policy issued by ACE. ECF 40, ¶ 9. Following the accident, Fisher sought compensation from Libert and D&G for her injuries. *Id.* ¶ 8. Libert and D&G demanded that ACE defend and indemnify them under its policy, but ACE denied them coverage. *Id.* ¶¶ 11-12.

## III. <u>The ACE Insurance Policy.</u>

The relevant ACE insurance policy—Business Auto Policy No. ISA H25553950 (the "ACE Policy")—was issued to Shadow Creek Towco LLC as the first named insured in 2021. ECF 25, ¶ 21. The policy was effective from July 1, 2021 to September 1, 2022 and extended to certain Shadow Creek subsidiaries, affiliates, and related entities, including Export. ECF 40, ¶ 9; ECF 24, ¶ 70 n.2; ECF 1, ¶¶ 6-7. As relevant here, the ACE Policy contains two sub-policies: (1) the Covered Autos Liability Coverage Part (the "Covered Autos sub-policy") and (2) the Compulsory Bodily Injury to Others Coverage Form (the "Compulsory Bodily Injury sub-policy"), the latter of which is a requirement under Massachusetts law. ECF 25, ¶¶ 23, 27; *see* ECF 25-1.

The Covered Autos sub-policy covers all "autos" garaged outside of the state of Nevada. ECF 25, ¶ 22. It provides that ACE "will pay all sums an 'insured' legally must pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies, caused by an 'accident' and resulting from the ownership, maintenance or use of a covered 'auto.'" *Id.* ¶ 23; ECF 25-1, at 28. It further provides that ACE has "the right and duty to defend any 'insured' against a 'suit' asking for such damages" but has "no duty to defend any 'insured' against a 'suit'

. . . to which this insurance does not apply." ECF 25, ¶ 23; ECF 25-1, at 28. The sub-policy defines an "insured," in relevant part, as:

> a. You for any covered "auto".
> b. Anyone else while using with your permission a covered "auto" you own, hire or borrow except: . . . (3) Someone using a covered "auto" while he or she is working in a business of selling, servicing, repairing, parking or storing "autos" unless that business is yours.
> c. Anyone liable for the conduct of an "insured" described above but only to the extent of that liability.

ECF 25, ¶ 25; ECF 25-1, at 28-29. "You" and "your" refer to the named insured; here, that is Export. ECF 25, ¶ 26.

The Compulsory Bodily Injury sub-policy similarly provides that ACE "will pay all sums an insured legally must pay as damages because of 'bodily injury' caused by a covered 'auto' in Massachusetts 'accidents.'" *Id.* ¶ 27; ECF 25-1, at 120. It further states that ACE has "a duty to defend any lawsuit" unless it decides, with the court's permission, to tender or pay "the maximum limits provided under this coverage, without the need for a judgment or settlement . . . or a release." ECF 25, ¶ 27; ECF 25-1, at 120-21. Under the sub-policy, an "insured" is defined as "(a) You; or (b) Anyone else using a covered 'auto' with your consent." ECF 25, ¶ 28; ECF 25-1, at 121. Coverage is limited to $20,000 per injured person per accident and to $40,000 per accident overall. ECF 25-1, at 122.

## IV. <u>Procedural History.</u>

In May 2024, ACE brought a declaratory judgment action in this Court, seeking a declaration that it owes no coverage to Libert or D&G for the accident (Counts I, II, III, IV, and V) and has no duty to defend them against Fisher's pre-suit claims unless and until a lawsuit is filed against them (Count VI). ECF 1, ¶¶ 32-55. The next month, Libert and D&G answered and asserted counterclaims seeking a declaration that ACE owes primary insurance coverage for any

claims brought by Fisher against them, and that ACE would have a duty to defend and indemnify them against Fisher's lawsuit. ECF 7, at 7-11. When Fisher, on July 8, 2025, brought claims against Libert and D&G in state court, they again demanded that ACE defend and indemnify them. ECF 40, ¶¶ 13-14. In November 2025, ACE moved for summary judgment on its claims and the defendants' counterclaims in this case. ECF 23. The defendants cross-moved for summary judgment in December 2025. ECF 32. After the parties opposed each other's motions, the Court held a hearing and took both motions under advisement. ECF 43.

## STANDARD OF REVIEW

Summary judgment is appropriate when, based upon the record, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant, would permit a rational factfinder to resolve the issue in favor of either party." *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990) (citation omitted). To prevail, the moving party must show that "there is no factual determination which a rational factfinder could make as to the existence or nonexistence of a fact that has the potential to change the outcome of the suit." *Gibson Found., Inc. v. Norris*, 88 F.4th 1, 5 (1st Cir. 2023) (quotation marks omitted). Courts "must consider the record and the reasonable inferences drawn therefrom in the light most favorable to the nonmovant," but "need not credit conclusory allegations, improbable inferences, and unsupported speculation." *Dixon-Tribou v. McDonough*, 86 F.4th 453, 458 (1st Cir. 2023) (quotation marks omitted). The non-moving party may not simply "rest upon mere allegation[s] or denials," but instead "must present affirmative evidence." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256-57 (1986). Where, as here, the parties have filed cross-motions for summary judgment, the court "review[s] each motion

separately, drawing facts and inferences in favor of the non-moving party." *Roberge*, 112 F.4th at 51 (quotation marks omitted).

## DISCUSSION

The parties seek declarations regarding ACE's coverage obligations to D&G and Libert for the bodily injury suit arising from the July 10, 2022 accident between Libert and Fisher.[2] Where, as here, subject matter jurisdiction is premised on diversity of citizenship, "state law supplies the substantive rules of decision." *Conformis, Inc. v. Aetna, Inc.*, 58 F.4th 517, 528 (1st Cir. 2023); *see Commercial Union Ins. Co. v. Walbrook Ins. Co., Ltd.*, 41 F.3d 764, 772-73 (1st Cir. 1994) (state law governs underlying substantive issues for diversity cases brought under Declaratory Judgment Act). If the parties agree on the state law that applies, the Court "is free to forego an independent [choice-of-law] analysis and accept the parties' agreement." *Patton v. Johnson*, 915 F.3d 827, 836 (1st Cir. 2019) (quotation marks omitted). At the hearing on the cross-motions for summary judgment, the parties agreed that Massachusetts law applies to their claims. Because that agreement is reasonable under the circumstances, the Court will accept their choice of law without conducting an independent choice-of-law analysis.

### I. <u>The ACE Covered Autos Sub-Policy.</u>

The parties dispute whether the defendants qualified as "insured" parties under ACE's Covered Autos sub-policy at the time of the accident. As relevant here, the sub-policy defines an insured party as "[a]nyone . . . using with [Export's] permission a covered 'auto' [Export] own[s], hire[s] or borrow[s]." ECF 25, ¶ 25. Excepted from that category, however, are individuals "using

---

[2] The defendants also move for summary judgment—and ACE does not dispute—that the Commerce Policy is excess to any coverage owed under the ACE Policy. ACE similarly seeks summary judgment without opposition on Count VI, arguing that because Fisher did not file suit until July 8, 2025, "ACE had no obligation to provide a defense before that date." ECF 24, at 13.

a covered 'auto' while . . . working in a business of selling, servicing, repairing, parking or storing 'autos' unless that business is [Export's]." *Id.* The parties contest whether Export owned the Vehicle at the time of the accident, whether Libert had Export's permission to use the Vehicle, and whether the defendants fall into the exception for those working in a business of selling, servicing, repairing, parking or storing autos. The Court will address each issue in turn.

A. <u>Ownership of the Vehicle.</u>

The parties first dispute which entity owned the Vehicle at the time of the accident. The defendants contend that Export still owned the Vehicle because it never provided a certificate of title to D&G or the Registrar of Motor Vehicles ("RMV"). ACE argues that Export's intent to transfer the Vehicle—not its transfer of the certificate of title—dictates ownership. As ACE sees it, because Export relinquished the Vehicle to D&G in 2018 and D&G retained exclusive possession of the Vehicle from that point on, Export was not the owner of the Vehicle on the date of the accident. The Court agrees with the defendants.

Ownership of the Vehicle is governed by two Massachusetts statutory schemes. The first, Article 2 of the Uniform Commercial Code (the "UCC"), governs the sale of goods. M.G.L. c. 106, §§ 2-101 through 2-725. The second, Chapter 90D, governs "Motor Vehicle Certificates of Title." M.G.L. c. 90D, §§ 1-39. The Supreme Judicial Court has clarified the relationship between the two schemes, explaining that Chapter 90D "does not supersede or abrogate [the UCC] but only adds additional requirements in certain circumstances." *Dion v. Silver City Dodge, Inc.*, 398 Mass. 58, 61 (1986). Accordingly, Massachusetts courts have determined that ownership of an automobile transfers only where the attempted transfer meets the requirements of the UCC and Chapter 90D. *See Fireman's Fund Ins. Cos. v. Blais*, 14 Mass. App. Ct. 254, 260 (1982) (transferor remained owner of vehicle due to failure to comply with requirements of Chapter 90D,

"independent of [the court's] reliance on the relevant [UCC] provisions"), *cert. denied*, 387 Mass. 1102 (1982); *accord Aetna Cas. & Sur. Co. v. A.L.J.A., Inc.*, 905 F. Supp. 36, 40-43 (D. Mass. 1995) (applying both provisions).[3]

The UCC defines a sale as "the passing of title from the seller to the buyer for a price (section 2-401)." M.G.L. c. 106, § 2-106(1). Section 2-401 applies, as relevant here, to the passing of title. *Id.* § 2-401. The statute distinguishes between two types of sales. The first category concerns sales where "the seller completes his performance with reference to the physical delivery of the goods . . . even though a document of title is to be delivered at a different time or place." *Id.* § 2-401(2). Title transfers governed by Section 2-401(2) occur either upon the seller's shipment of the goods or delivery of the goods at destination, irrespective of any document of title. *Id.* § 2-401(2)(a)-(b). The second category pertains to sales "where delivery is to be made without moving

[3] ACE disagrees, relying on decisions from other state courts to argue that UCC Section 2-401(2) applies and that Chapter 90D applies only "in situations where § 2-401(3) applies because 'the criteria found in [the UCC], and not the Certificate of Title Act, identify the owner of a motor vehicle for purposes of determining insurance coverage in case of an accident.'" ECF 45, at 4-5 (quoting *Smith v. Nationwide Mut. Ins.*, 37 Ohio St. 3d 150, 153 (1988)). This argument is unavailing where, as here, the Massachusetts Appeals Court has concluded otherwise. "When sitting in diversity, '[the Court's] objective is solely to determine what is the law as indicated by [the Commonwealth's] authoritative sources.'" *Alejandro-Ortiz v. Puerto Rico Elec. Power Auth. (PREPA)*, 756 F.3d 23, 26-27 (1st Cir. 2014) (quoting *Rodriguez-Suris v. Montesinos*, 123 F.3d 10, 13 (1st Cir. 1997)). If "a state's highest court has not spoken on a matter of state substantive law, a federal court sitting in diversity must ascertain the rule the state court would most likely follow under the circumstances." *Rathbun v. Autozone, Inc.*, 361 F.3d 62, 66 (1st Cir. 2004) (quotation marks and citation omitted). And a decision from "an intermediate appellate state court . . . is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." *Comm'r v. Bosch's Estate*, 387 U.S. 456, 465 (1967); *see Fid. Union Trust Co. v. Field*, 311 U.S. 169, 177-78 (1940) ("An intermediate state court in declaring and applying the state law is acting as an organ of the State and its determination, in the absence of more convincing evidence of what the state law is, should be followed by a federal court in deciding a state question."). Absent any "telltales indicating that the state's highest tribunal would have ruled otherwise," the Court will "accept the appeals court's interpretation as authoritative." *Hamm v. Latessa*, 72 F.3d 947, 955 n.12 (1st Cir. 1995) (quotation marks omitted).

the goods." *Id.* § 2-401(3). For sales governed by Section 2-401(3), "if the seller is to deliver a tangible document of title, title passes at the time when and the place where the seller delivers such documents." *Id.* § 2-401(3)(a). Where "no documents of title are to be delivered, title passes at the time and place of contracting." *Id.* § 2-401(3)(b). Sections 2-401(2) and 2-402(3) apply "[u]nless otherwise explicitly agreed" by the parties to the sale. *Id.* §§ 2-401(2) and 2-401(3).

Massachusetts courts apply Section 2-401(3) to automobile sales like the one at issue in this case. *See, e.g.*, *Commonwealth v. Wellesley Toyota Co., Inc.*, 18 Mass. App. Ct. 733, 735 n.6 (1984) ("Where, as with a car, it is necessary to deliver a document of title, the sale is completed at the time when and the place where the seller delivers the title documents." (citing M.G.L. c. 106 § 2-401(3))); *Blais*, 14 Mass. App. Ct. at 259 (applying Section 2-401(3)(a) to vehicle sale); *Mechanics Nat. Bank of Worcester v. Gaucher*, 7 Mass. App. Ct. 143, 147-48 (1979) (Section 2-401(3) governs sales of cars, which customers can drive away and do not require "physical delivery" by the seller).[4] Under Section 2-401(3), title "passes . . . when and . . . where the seller

[4] ACE contends that Section 2-401(3) does not apply because the sale here "involved the sale and movement of goods, *i.e.*, the transfer of possession from Export to [D&G]." ECF 24, at 9. In *Blais*, ACE asserts, the Appeals Court concluded that Section 2-401(3) applied because the transferee's "possession of the automobile prior to the proposed sale compels a finding that delivery was to be made 'without moving the goods.'" *Blais*, 14 Mass. App. Ct. at 259. In ACE's view, where the undisputed facts show that D&G "did not have possession of the Vehicle before the date of the sale," Section 2-401(3) must not apply. ECF 24, at 9. ACE overreads *Blais*. *Blais* did not hold that Section 2-401(3) is inapplicable where the transferor still holds possession of the goods upon their sale. Rather, it determined that the transferee's possession of the goods at the time of sale was *sufficient* to trigger Section 2-401(3)'s application, not that it was *necessary* to do so. Under Massachusetts law, the distinction between Sections 2-401(2) and 2-401(3) turns not on whether the goods will physically change hands after a sale, but on whether the sale requires *delivery by the seller*. *See* M.G.L. c. 106, § 2-401(2) ("title passes to the buyer at the time and place at which *the seller completes his performance with reference to the physical delivery of the goods*" (emphasis added)); *id.* § 2-401(2)(a) (applies where "the contract requires or authorizes *the seller to send the goods*, but does not require him to deliver them *at destination*" (emphases added)); *id.* § 2-401(2)(b) (applies where "the contract *requires delivery at destination*" (emphasis added)); *Gaucher*, 7 Mass. App. Ct. at 147 (contrasting Section 2-401(3)'s applicability to goods buyers can "pick up" or "drive away" and Section-401(2)'s requirement of "physical delivery"

delivers such documents." M.G.L. c. 106 § 2-401(3)(a). Accordingly, ownership of the Vehicle hinges on whether Export delivered the certificate of title to D&G by the date of the accident. Where it is undisputed that Export did not do so, a reasonable jury would be compelled to conclude that Export remained the owner of the Vehicle when the accident occurred.

This conclusion is reinforced by Chapter 90D's title requirements. Section 15 of Chapter 90D provides that where, as here, an owner wishes to transfer its interest in "a vehicle for which a certificate of title has been issued" to another, the owner "shall, at the time of the delivery of the vehicle, execute an assignment . . . and cause the certificate and assignment to be mailed or delivered to the transferee or to the [RMV]." M.G.L. c. 90D, § 15(a). The statute further provides, in Section 15(e), that, "[e]xcept . . . as between the parties, a transfer by an owner is not effective until the provisions of this section . . . have been complied with." *Id.* § 15(e).

There is no dispute that, by failing to provide the Vehicle's certificate of title to D&G or the RMV, Export did not comply with the requirements of Section 15(a). ECF 41, ¶ 3. Rather, ACE claims that Section 15(e)'s exception applies. In its view, Section 15(e)'s phrase "[e]xcept . . . as between the parties" suggests "that the delivery of a title certificate should not be dispositive in disputes 'between the parties.'" ECF 24, at 7 n.6. In other words, ACE appears to contend that Section 15's procedural requirements should not apply to any ownership disputes between the transferor and transferee. But ACE has identified no case law from Massachusetts courts to support its broad interpretation of Section 15(e). To the contrary, in *Blais*, the Appeals Court applied

---

typically applicable where, for example, goods "requir[e] special handling to enable the buyer to take possession"). It is therefore consistent with *Blais* and the text of Section 2-401 to conclude that Section 2-401(3) applies here, where it is undisputed that D&G "picked up the Vehicle from Export." ECF 25, ¶ 10; *see Aetna Cas. & Sur. Co.*, 905 F. Supp. at 41-42 (rejecting plaintiff's argument that Section 2-401(2), not 2-401(3), should apply where the contested vehicle was physically moved from transferor's lot to transferee's residence upon sale, because "[t]he question is not whether the goods will be moved, but who will move them").

Section 15 to adjudicate an analogous dispute between a transferor and transferee concerning the ownership of a car for which the transferor had failed to deliver certificate of title. *See Blais*, 14 Mass. App. Ct. at 257-60. And it interpreted the phrase "except . . . as between the parties" to provide an exception from Section 15's requirements only where the parties reached an "explicit agreement" to "eliminate the need for execution of the assignment and delivery of the title certificate." *Id.* at 260-61.

Trying another tack, ACE argues that an explicit agreement to waive the title requirement existed between Export and D&G such that the Section 15(e) exception applies. That argument fares no better. Absent from the record is any evidence that the parties "agree[d] to postpone delivery of [the] title document." *Aetna Cas. & Sur. Co.*, 905 F. Supp. 26 at 42. Instead, the record makes clear that D&G repeatedly requested the certificate of title from Export and Export never provided it. ECF 41, ¶¶ 3, 7-8. There is, therefore, "insufficient evidence to anchor the requisite meeting of the minds for an 'explicit agreement' about the terms of the sale" and title requirements, and no reasonable jury could conclude that such an agreement existed. *Aetna Cas. & Sur. Co.*, 905 F. Supp. 26 at 41-42 (exception applied where evidence demonstrated that auto-dealer buyer "agreed to purchase the car on [auto-dealer seller]'s promise to apply for a duplicate certificate of title" and no evidence indicated that either party objected to those terms, but exception did not apply to sale "in limbo" where individual buyer "insisted on getting the certificate of title, but [auto-dealer seller] never really knew when it would arrive" and buyer "attached the plates of another car he owned onto the [vehicle] and periodically checked with [seller] about the certificate" but was never able to register the vehicle in his name). Absent any applicable exception, Export's failure to comply with the requirements of Section 15 compels the conclusion that, as a matter of law, Export remained the owner of the Vehicle at the time of the accident.

B. Whether Export Granted Libert Permission to Use the Vehicle.

ACE next contends that even if Export owned the Vehicle at the time of the accident, Libert lacked Export's permission to use it and therefore does not qualify as an "insured" under the ACE Policy. *See* ECF 25, ¶ 25. In ACE's view, the ACE Policy requires that individuals like Libert obtain specific, individualized permission from Export to operate a covered auto even when they are doing so within the scope of their employment for an entity that has permission to operate the auto. Thus, even though ACE does not dispute that D&G had Export's permission to operate the Vehicle or that Libert was operating the Vehicle with D&G's permission when the accident occurred, it reads the policy to exclude Libert from coverage unless he obtained permission directly from Export to do so. ECF 41, ¶ 12; ECF 31-3, at 53:8-19, 55:2-15; ECF 24, at 11. The defendants, for their part, argue that ACE's reading of the phrase "with [Export's] permission" is too narrow and that, under the proper reading of the policy and based on the undisputed facts, Libert is an "insured" because he was operating the Vehicle within the scope of his employment with D&G when the accident happened.

"'The proper interpretation of an insurance policy is a matter of law to be decided by a court.'" *Dorchester Mut. Ins. Co. v. Krusell*, 485 Mass. 431, 436-37 (2020) (quoting *Boazova v. Safety Ins. Co.*, 462, Mass. 346, 350 (2012)). When interpreting language in an insurance policy, courts "must construe the words of the policy in their usual and ordinary sense." *Id.* at 437 (quotation marks omitted). To do so, courts "consider what an objectively reasonable insured, reading the relevant policy language, would expect to be covered." *Id.* (quotation marks omitted). Ambiguity exists where a term or phrase "is susceptible of more than one meaning and reasonably intelligent persons would differ as to which meaning is the proper one." *Id.* (quotation marks

omitted). Any ambiguities "are interpreted against the insurer who used them and in favor of the insured." *Id.* (quotation marks omitted).

Construing the phrase "with [Export's] permission" in its ordinary sense and resolving any doubts about its meaning in favor of the defendants, the Court concludes that ACE's reading—to require personalized permission for each individual user of the covered auto—is not in accordance with how an objectively reasonable insured would interpret the phrase. ACE does not contest that its policy would cover a business operating a covered auto "with [Export's] permission." A reasonable insured would not expect the ACE Policy to further require that the individuals working for that business seek permission directly from Export to operate the vehicle in the scope of their employment. Under the only reasonable reading of the phrase, Libert operated the Vehicle "with [Export's] permission" so long as his employer, D&G, had Export's permission to use the Vehicle and permitted Libert to use it within the scope of his employment. The undisputed facts show that Export gave D&G permission to use the Vehicle when it provided D&G with a repair plate and annual registration stickers, and that D&G gave Libert permission to drive the Vehicle on the day of the accident to get advertising applied to the exterior. Accordingly, under the proper reading of the ACE Policy, no reasonable jury could conclude that Libert was using the Vehicle without Export's permission.

C. Exception for Those Working in Certain Auto-Related Businesses.

The parties additionally contest the meaning of the so-called "auto business exclusion" in the ACE Policy. Excluded from those insured by the ACE Policy are individuals "using a covered 'auto' while . . . working in a business of selling, servicing, repairing, parking or storing 'autos' unless that business is [Export's]." ECF 25, ¶ 25. ACE contends that the defendants are excluded from the policy's coverage because, around the time of the accident, Libert was working for D&G

and D&G serviced autos by providing roadside assistance. The defendants do not dispute that, during that time, D&G offered roadside assistance, including changing flat tires, jumping dead batteries, and providing gasoline. *See* ECF 31-1, at 59:16-60:3; ECF 31-2, at 29:7-20; ECF 31-3, at 17:17-19:3. Nor do they disagree that those activities qualify as "servicing" automobiles under the ACE Policy. *See Grisham v. Allstate Ins. Co.*, 128 N.M. 340, 342 (1999) (construing the term "servicing" under the auto business exclusion to mean making "fit for service"; "inspecting, adjusting, repairing, refueling, etc.," and "to make fit for use; to repair; restore to condition for service" (dictionary citations omitted)). Instead, they argue that, regardless of D&G's business offerings, the exclusion does not apply because it is undisputed that, on the day of the accident, Libert was operating the Vehicle to get it outfitted with D&G advertising, not to service an automobile. Put differently, the defendants read the exclusion to apply only where the vehicle user was engaged in an excluded activity when the accident occurred.

The plain language of the exclusion is incompatible with the defendants' interpretation. That language, read in its "usual and ordinary sense," is not, as the defendants urge, addressed to whether the person operating the vehicle was engaged in a particular excluded activity at the time of the accident. *Krusell*, 485 Mass. at 437. Instead, the exclusion applies when the person using the covered automobile did so "while he or she [was] *working in a business of* selling, servicing, repairing, parking or storing 'autos.'" ECF 25, ¶ 25 (emphasis added). This language concentrates on the nature of the services offered by the business with control over the automobile and on whether the person driving the vehicle was working for that business. It does not focus only on the nature of the work performed by the driver at the time of the accident. *See Humble Oil & Ref. Co. v. Lumbermens Mut. Cas. Co.*, 490 S.W.2d 640, 643 (Tex. Civ. App. 1973) ("It must be observed that the exclusion does not limit itself with the question of 'servicing' of the automobile but

specifically applies to the 'business of servicing' automobiles."). Indeed, the defendants' reading of the exclusion would render the words "working in a business of" unnecessary, as their construction would apply equally when the person using the automobile did so "while he or she [was] . . . selling, servicing, repairing, parking or storing 'autos.'" ECF 25, ¶ 25. Such an interpretation conflicts with the principle that "[e]very word in an insurance contract must be presumed to have been employed with a purpose and must be given meaning and effect whenever practicable." *Boston Gas Co. v. Century Indem. Co.*, 454 Mass. 337, 355-56 (2009) (quotation marks omitted).

Construing the auto business exclusion to encompass Libert's use of the Vehicle on behalf of D&G is consistent with the purpose of the exclusion. As the Appeals Court has explained, "[t]he exclusion is based on the assumption that the lack of control over the insured vehicle increases the risk to the owner's insurer." *Borden v. Progressive Direct Ins. Co.*, 87 Mass. App. Ct. 391, 393 (2015). Thus, "once the automobile business assume[s] control over the insured vehicle, that business should bear the cost of insuring for such risks under its own liability policy." *Id.*; *see also Motorists Commercial Mut. Ins. Co. v. Hartwell*, 549 F. Supp. 3d 220, 229 (D. Mass. 2021). Here, even though Export remained the owner of the Vehicle, it let D&G and D&G's employees and contractors operate and control the Vehicle. Under the circumstances, it accords with the purpose of the auto business exclusion to conclude that D&G—a business that, among other things, serviced automobiles—should bear the risk of insuring a vehicle in its control.

Any reasonable jury, taking all facts and inferences in favor of the defendants, would conclude that the auto business exclusion applies. The defendants are therefore not entitled to coverage under the Covered Autos sub-policy of the ACE Policy.

## II. The ACE Compulsory Bodily Injury Sub-Policy.

The parties further dispute whether the defendants are entitled to coverage under the Compulsory Bodily Injury sub-policy contained within the ACE Policy. The ACE Policy includes a Massachusetts Mandatory Endorsement that incorporates a "Compulsory Bodily Injury to Others Coverage Form." ECF 25, ¶ 27; ECF 25-1, at 120-122. That form, as required by Massachusetts law,[5] obligates ACE to "pay all sums an insured legally must pay as damages because of 'bodily injury' caused by a covered 'auto' in Massachusetts 'accidents'" and to "defend any lawsuit" "brought against anyone covered under this coverage for damages which might be payable under this coverage." ECF 25, ¶ 27. The sub-policy defines an "insured" as Export or "[a]nyone else using a covered 'auto' with [Export's] consent." *Id.* ¶ 27. Unlike the Covered Autos sub-policy, there is no auto business exception to the Compulsory Bodily Injury sub-policy. *See* ECF 25-1, at 120-22.

The defendants contend that they qualify as "insureds" under the Compulsory Bodily Injury sub-policy because they were operating the Vehicle with Export's consent. The Court agrees because, as with the Covered Autos sub-policy and based on the same undisputed facts, the defendants had Export's permission to operate the Vehicle. Accordingly, the Compulsory Bodily Injury sub-policy obligates ACE to defend and indemnify the defendants in the underlying lawsuit.

## III. The Commerce Policy.

The defendants also assert that they are entitled to summary judgment on whether the Commerce Policy's coverage is excess to any coverage provided by the ACE Policy. ACE does not dispute that, should the Court determine that Export owned the Vehicle at the time of the accident, the defendants are entitled to judgment on this issue. Because the Court has concluded

[5] *See* M.G.L. c. 90, § 34A.

as a matter of law that Export owned the Vehicle when the accident occurred, the defendants are entitled to a declaration that the Commerce Policy is excess to the coverage owed under the Compulsory Bodily Injury sub-policy of the ACE Policy.

**IV. <u>ACE's Pre-Suit Obligations.</u>**

Finally, ACE moves for summary judgment on Count VI, seeking a declaration that it "had no obligation to provide [Libert or D&G] a defense before" July 8, 2025, the date Fisher filed suit. ECF 24, at 13. Because the defendants do not oppose this part of ACE's motion, it will be granted.

## CONCLUSIONS AND ORDERS

For the foregoing reasons, the parties' cross-motions for summary judgment, ECF 23 and 32, are GRANTED in part and DENIED in part. Plaintiff ACE's motion for summary judgment, ECF 23, is GRANTED as to Counts II, III, and VI of the complaint and Count I of the defendants' counterclaims, and it is DENIED as to Counts I, IV, and V of the complaint and Count II of the defendants' counterclaims. The defendants' motion for summary judgment, ECF 32, is GRANTED as to Counts I, IV, and V of the complaint and Count II of their counterclaims, and DENIED as to Counts II, III, and VI of the complaint and Count I of their counterclaims.

The Court will enter declaratory judgment as follows:

1. Export Enterprises of Massachusetts, Inc. was the legal owner of the 2012 Ford van (the "Vehicle") at the time of the July 10, 2022 accident between Trevor Libert and Patricia Fisher, and the Vehicle was a covered auto under the Business Auto Policy No. ISA H25553950 (the "ACE Policy");

2. The defendants are not entitled to coverage under the Covered Autos Liability Coverage Part of the ACE Policy;

3. The defendants are entitled to coverage under the Compulsory Bodily Injury to Others Coverage Form of the ACE Policy;

4. The Commerce Policy, Business Auto Policy No. BDQRVN, is excess to the coverage owed under the Compulsory Bodily Injury to Others Coverage Form of the ACE Policy; and

5. ACE had no pre-suit duty to defend Libert or D&G Towing and Auto Services, Inc. before Fisher filed suit in state court on July 8, 2025.

SO ORDERED.

/s/ Julia E. Kobick
JULIA E. KOBICK
UNITED STATES DISTRICT JUDGE

Dated: August 25, 2026